**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RONNI HUFNAGEL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 11-00611 |
| | ) | Judge Nora Barry Fischer |
| vs. | ) | |
| | ) | |
| DeLENA CIAMACCO d/b/a/ | ) | |
| THE FRIESIAN EMPIRE & EQUINE | ) | |
| CENTER and MATT BRYNER | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

## I.  INTRODUCTION

This is a diversity action wherein Plaintiff Ronni Hufnagel ("Hufnagel") has brought suit

against Defendants DeLena Ciamacco (d/b/a The Friesian Empire and Equine Center)

("Ciamacco") and Matt Bryner ("Bryner") alleging breach of contract, negligence and

contractual duty to a third party.  These claims arise out of Ciamacco's and Bryner's[1] conduct

with regard to the care and training of Hufnagel's Friesian horses (Docket No. 38 at ¶¶ 4, 19,

21).  Hufnagel targets Ciamacco for her alleged failure to properly maintain the horses' caloric

intake and general health.  Hufnagel's breach of contractual duty to a third-party beneficiary, is

based on Ciamacco's alleged contract with Bryner to care for Hufnagel's horses.  (*Id.* at ¶¶ 27-

41).  Hufnagel is a resident of Pennsylvania (*Id.* at ¶ 1), Ciamacco is a resident of Ohio (*Id.* at ¶

2) and Bryner is currently a resident of Maryland (*Id.* at ¶ 3).  Thus, there is complete diversity

---

[1] Given the lack of service by Hufnagel on Bryner, this Court issued a Rule 4(m) Order on September 9, 2011, directing Hufnagel to show cause why service had yet to be made. (Docket No. 14).  On September 21, 2011, this Court Ordered that the claims against Bryner were dismissed, without prejudice. (Docket No. 15).  However, on December 29, 2011, Hufnagel filed a Motion to Reinstate Defendant, Matt Bryner (Docket No. 35), which was granted that same day in a text Order.  Thereafter, Hufnagel filed an Amended Complaint on January 9, 2012, reflecting Defendant Bryner's current address. (Docket No. 38).  The Amended Complaint (Docket No. 38) is identical to the Complaint (Docket No. 1) in all other respects.  Bryner has yet to be properly served.

between the parties.  Hufnagel seeks an amount in excess of $75,000.00 plus interest and court costs from Ciamacco. (*Id.* at ¶¶ 27-35).

Presently before the Court is a jurisdictional dispute concerning Ciamacco's argument that this Court lacks personal jurisdiction over her, such that Hufnagel's claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2). For the reasons that follow, this Court finds that it does not have personal jurisdiction over Ciamacco and grants the motion, in part.  However, rather than dismiss the case outright, the Court will exercise its discretion and transfer this matter to the United States District Court for the Southern District of Ohio.


## II.  PROCEDURAL BACKGROUND

On July 8, 2011, Ciamacco filed a Motion to Dismiss Pursuant to 12(b)(2) (Docket No. 5), as well as a Brief in Support of her Motion to Dismiss and to Transfer Venue to the Southern District of Ohio (Docket No. 6).[2]  In response, on July 29, 2011, Hufnagel filed a Brief in Opposition to Ciamacco's Motion to Dismiss and to Transfer Venue (Docket No. 8) as well as an Affidavit of Ronni Hufnagel (Docket No. 9).  Given same, this Court entered an Order on August 2, 2011, denying the Motion to Dismiss, without prejudice and permitting limited discovery for the purpose of establishing whether jurisdiction and venue properly lie with this Court. (Docket No. 10).  As said limited discovery was to conclude on November 1, 2011, this Court scheduled Hearing and Oral Argument on the issue of jurisdiction and venue for

---

[2] Ciamacco's Motion to Dismiss does not incorporate a Motion to Transfer Venue.  Instead, Ciamacco raises the potential of a Transfer of Venue in her Brief and only seeks a Transfer of Venue if her Motion to Dismiss fails. (Docket Nos. 5 and  6).

November 3, 2011. (*Id.*).    However, as a result of the parties' Motion for Extension of same

(Docket No. 24), said Hearing[3] did not occur until December 8, 2011 (Docket No. 29).

During the December 8, 2011 evidentiary Hearing, the Court heard testimony from

Ciamacco and Hufnagel and received nine exhibits.[4] (Docket Nos. 29 and 29-1).   The Court took

the Motion to Dismiss[5] under advisement, pending the submission of the parties' competing

Findings of Fact and Conclusions of Law. (*Id.*).    Further, the Court ordered preparation of the

transcript. (*Id.*).   The Transcript having been prepared and filed (Docket No. 39), the parties filed

their proposed findings of fact and conclusions of law. (Docket Nos. 47, 48, 50, 51). Thus, the

parties' dispute as to jurisdiction has been fully addressed and is now ripe for disposition.   The

Court now turns to its findings of fact.   In determining the facts, the Court notes that both

Hufnagel and Ciamacco presented credible testimony. *See EBC, Inc. and State Steel Supply, Inc.*

*v. Clark Building Systems, Inc.,* Civ. A. No. 05-1549, 2008 WL 4922107, at \*9 (W.D.P.a Nov.

13, 2008) (citing *Parker v. Long Beach Mortgage Company,* 534 F.Supp.2d 528, at 535-536

(E.D.Pa. 2008)) (permitting the Court to assess the credibility of witnesses while resolving

factual disputes).

## III. FINDINGS OF FACT[6]

Ciamacco started The Friesian Empire and Equine Center (hereinafter "Friesian Empire")

between 2000 and 2002. (Docket No. 39 at p. 6, ln 18).   The Friesian Empire is located in Ohio.

(Docket No. 38 at ¶ 2).   Ciamacco has primarily dealt with Florida, Michigan, Illinois and New

---

[3] Although originally scheduled for a Hearing and Oral Argument, ultimately the Court only held an evidentiary hearing, as the parties did not put forth any oral argument. (Docket No. 29).

[4] The exhibits include the contract; a FHANA breeders' list advertisement form; advertisements for the sale of various horses; documents detailing sales of horses; and several checks made payable to Ciamacco from various individuals.

[5] The Court reopened the Motion to Dismiss on December 9, 2011 in a text entry on the docket.

[6] The Findings of Fact are derived from the pleadings, the parties' Findings of Fact and the Court's independent review of the entire December 8, 2011 transcript and exhibits.

York residents in connection with the Friesian Empire for services which were rendered in Ohio. (Docket No. 39 at p. 41, lns. 1-16; p. 42, lns. 10-21).  She also hosted two Keurings[7] at the Friesian Empire and only three out of state residents attended. (*Id.* at p.11, lns. 20-21; p.12, lns. 7-8).  Ciamacco has never conducted business in Pennsylvania (*Id.* at p. 10, lns. 14-16) and has never had direct contact with Pennsylvania regarding the operation of the Friesian Empire. (*Id.* at p.14, lns. 14-18).  She has only dealt with two other Pennsylvania residents in connection with the Friesian Empire for services which were rendered in Ohio. (*Id.* at p.18, lns. 1-8; p. 19, lns. 13-18; p.49, lns. 1-4; 18-20).  Indeed, Ciamacco testified that she had never even been to Pennsylvania before the December 8, 2011 Hearing. (*Id.* at p. 14, lns. 14-18).

The Friesian Horse Association of North America (hereinafter "FHANA") is a national organization, with members throughout the country. (*Id.* at p. 23, lns. 17-19; p.24, lns. 1-3).  In 2002, when Ciamacco began breeding horses, she placed a small advertisement (quarter of an inch to an inch by five inches) in the FHANA journal. (*Id.* at p. 9, lns. 21-25; p. 10, lns. 1-13). That 2002 advertisement is the only advertisement that Ciamacco has ever placed in the FHANA journal. (*Id.* at p. 27, ln. 22).  FHANA also has a website, which contains a list of breeders and sellers. (*Id.* at p. 24, lns. 21-23).  Ciamacco testified that she should be listed on same because she pays FHANA an annual fee, which includes payment for such a listing. (*Id.* at p. 25, lns. 2-5).

In addition, the Friesian Empire has a website. (*Id.* at p. 28, lns. 2-3).  The website does not have an online store yet, but it does advertise horses for sale and sells gift certificates for on-site lessons and parties. (*Id.* at p. 28, lns. 8-17).  The Friesian Empire has never sold gift certificates to out of state residents. (*Id.* at p. 28, lns. 18-20).  Further, Friesian Empire employees have advertised horses for sale on various other websites, including AGDirect.com,

---

[7] Keurings are horse inspections. (*See* Docket No. 39 at p.56, lns. 22-25).

4

HorseClassified.com, DreamHorse.com and Equine.com. (*Id*. at p. 28, lns. 21-25; p. 29, lns. 1-12).   Indeed, Ciamacco testified that people from all over the country were trying to buy her Grand Reserve World Champion Tennessee Walker horse, which was ultimately sold to a Florida resident. (*Id*. at p. 29, lns. 18-20; p.30, lns. 18-20).   Three other horses were sold to residents from Indiana, Louisiana and West Virginia. (*Id*. at p. 31, lns. 4-23; p. 33, lns. 1-5; p. 33, lns. 8-12).

When the Complaint was filed, Hufnagel was the owner of four Friesian horses, a type of show horse that can be valued at more than $1 million when well-bred, well-trained, and well-developed.  (Docket No. 38 at ¶ 4).   Hufnagel asserts that her horses were noted to have promise as show horses by judges from FHANA, who suggested that she move the horses to Old Oak Farm in Ohio for further training, as she was planning to show the horses in September 2009. (*Id*. at ¶¶ 6-7).

While at Old Oak Farm, Bryner trained and cared for Hufnagel's horses, but in May 2009, Bryner told Hufnagel that she would need to move her horses to the Friesian Empire when he left employment with Old Oak Farm, to ensure their proper care.  (*Id*. at ¶¶ 7-9).   Hufnagel was aware of the Friesian Empire because she had been there for horse inspections and clinics. (Docket No. 39 at p. 56, lns. 22-25).   She also recalls seeing an advertisement for the Friesian Empire, but cannot remember its exact location. (*Id*. at p. 68, lns. 1-16).   It may have been in the FHANA journal. (*Id*.).   In reliance on Bryner's recommendation, Hufnagel moved the horses to the Friesian Empire.  (Docket No. 38 at ¶¶ 9-10; Docket No. 39 at p. 57, lns. 1-12; p.70, lns. 19-25).

Although Hufnagel boarded her four horses at the Friesian Empire, (Docket No. 39 at p. 55, lns. 4-13) only two of the four horses were allegedly mistreated at the Friesian Empire. (*Id*. at

p. 74, lns. 14-15).  Bryner transported the two horses that were allegedly mistreated from Old Oak Farm to the Friesian Empire. (*Id*. at p.76, lns. 7-9).  Hufnagel and her husband transported the other two horses from Pennsylvania to the Friesian Empire. (*Id*.).

Hufnagel executed the contract at the Friesian Empire, upon the delivery of the horses.[8] (*Id*. at p. 74, lns. 8-9).  The contract was to be performed at the Friesian Empire in Ohio and the contract made reference to Ohio law. (Docket No. 5-1, p.7).  Under the terms of the contract, Hufnagel paid the Friesian Empire for boarding, which entailed feeding the horses, cleaning out their stalls, turning them out when necessary and properly exercising them. (Docket No. 39 at p. 64, lns. 7-10).  Hufnagel had a separate agreement with Bryner. (*Id*. at p. 64, lns. 13-15).  Pursuant to that agreement, Bryner was responsible for the horses' training and received compensation from Hufnagel for same. (*Id*. at p. 64, lns. 12-17).  However, during the horses' last week at the Friesian Empire, Bryner fed and trained them. (*Id*. at p. 65, ln 7-9).  Hufnagel initially paid boarding costs to Ciamacco, but in August 2009, she began making a single monthly payment to Bryner, who then paid boarding costs to Ciamacco.  (Docket No. 38 at ¶¶ 10-11).  There was no agreement of any kind between Ciamacco and Bryner. (Docket No. 39 at p. 51, lns. 9-11).

The horses were boarded at the Friesian Empire from approximately June 15, 2009 through August 7, 2009. (*Id*. at p. 69, lns. 5-6).  Hufnagel asserts that her horses were healthy, well-adjusted to people, and possessed an exemplary physical appearance when delivered to the Friesian Empire.  (Docket No. 38 at ¶¶ 13-14).  During their time at the Friesian Empire,

---

[8] During the December 8, 2011 Hearing, it was brought to the Court's attention that two contracts were involved in this case, but only one dealt  with the two horses that were allegedly mistreated.  The first contract pertains to three of the four horses. (Docket No. 39 at p. 74; 77).  Two of those three horses were the horses that were allegedly mistreated. (*Id*. at p.77, lns. 5-7).  The first contract was negotiated and signed in June 2009, upon delivery of the horses to the Friesian Empire, in Ohio. (*Id*. at p.76, lns. 20-23).  The second contract pertains to only one horse, which is not alleged to have been mistreated. (*Id*. at p.77, lns. 9-10).  The second contract was sent to Hufnagel for her signature, by either mail or facsimile in July 2009. (*Id*. at p.74, lns. 6-25).  This Court will only address the contract which is at issue, i.e. the first contract which pertains to the two horses that were allegedly mistreated.

Hufnagel never visited her horses. (Docket No. 39 at p. 65, ln. 23). Instead, she spoke with Bryner every two weeks regarding the horses' progress. (*Id*. at p. 66, lns. 16-18). Bryner never informed Hufnagel that two of her horses were losing weight, nor complained about their care. (*Id*. at p. 67, lns. 1-5). The horses were removed from the Friesian Empire around August 7, 2009 and Bryner took them to a horse show in Columbus, Ohio. (*Id*. at p. 66, lns. 1-12). Upon seeing the horses at the Columbus horse show, Hufnagel observed that they were underweight, depressed, frightened, and exhibited low energy levels. (Docket No. 38 at ¶¶ 18-19). Hufnagel maintains that upon questioning Bryner about the situation, he stated that the horses were underfed because Ciamacco was not providing sufficient food and water. (*Id.* at ¶ 20). Hufnagel terminated her relationship with Bryner at the Columbus horse show (Docket No. 39 at p. 67, lns. 16-19) and returned the horses to her Pennsylvania farm (Docket No. 38 at ¶ 22).

The horses gained more than fifty pounds after being brought back to Hufnagel's farm, however, they were judged to be too thin to receive a FHANA rating. (*Id.* at ¶¶ 22-24). Ultimately, Hufnagel sold three of the four horses. She sold the two allegedly mistreated horses for $30,000.00 and $25,000.00, respectively. (Docket No. 39 at p. 72, lns. 21-25; p. 73, lns. 1-2). Hufnagel also sold one of the healthy horses (for an unspecified amount) and retained ownership of the other healthy horse. (*Id*. at p.74, lns. 21-11). Consequently, she seeks to be compensated for what she asserts were previously healthy horses. (Docket No. 38 at ¶¶ 27-35).

## IV. OVERVIEW OF THE PARTIES' ARGUMENTS

Ciamacco argues that this case should be dismissed because there are no allegations that she has any contacts with Pennsylvania or conducted any business in Pennsylvania (Docket No. 5 at ¶ 20); the contract at issue was formed in Ohio and was to be performed in Ohio (Docket No. 6 at 2); Ciamacco never traveled to Pennsylvania in regard to the formation of the contract

(Docket No. 6 at 2); and the contract at issue references Ohio law (Docket No. 6 at 11).[9]  In the alternative, Ciamacco contends that this case should be transferred to the Southern District of Ohio, where she resides; where the contract was formed and executed; where the events giving rise to the claims occurred; and where most of the witnesses and evidence are located. (Docket No. 6 at 15-19).

Hufnagel counters that Ciamacco is subject to this Court's jurisdiction because Ciamacco entered into a contract with a Pennsylvania resident; decided to board Pennsylvania horses owned by Pennsylvania residents; advertised in a Friesian Horse Journal, which was sent to Pennsylvania residents, including her (Docket No. 8); and she secures sales through various websites (Docket No. 51 at ¶ 104).

V. LEGAL STANDARD

   A.  Burden of Proof

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a court may dismiss a complaint for lack of jurisdiction over the person. Fed.R.Civ.P. 12(b)(2). A defendant bears the initial burden of raising a lack of personal jurisdiction defense. *See* Fed.R.Civ.P. 12(h)(1); *National Paintball Supply, Inc. v. Cossio,* 996 F.Supp. 459, 460 (E.D. Pa. 1998). However, "[w]here the defendant has raised a jurisdictional defense, the plaintiff bears the burden of establishing either that the cause of action arose from the defendant's forum-related activities (specific jurisdiction) or that the defendant has 'continuous and systematic' contacts with the forum state (general jurisdiction)." *Mellon Bank (East) PSFS, N.A. v. DiVeronica Bros., Inc.,* 983 F.2d 551, 554 (3d Cir. 1993).

---

[9] Ciamacco correctly notes that Hufnagel failed to provide a "short and plain statement of the grounds for the Court's jurisdiction" in her May 10, 2011 Complaint, as required by Federal Rule of Civil Procedure 8(a)(1). (Docket No. 6 at 2).

If no evidentiary hearing is held on the motion to dismiss, "the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93, 97 (3d Cir. 2004). By contrast, "if the Court conducts an evidentiary hearing, the plaintiff has the more substantial burden of proving that personal jurisdiction is proper by a preponderance of the evidence." *Leone v. Cataldo,* 574 F.Supp.2d 471, 477 (E.D. Pa. 2008) (citing *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.,* 557 F.2d 1280, 1285 (9th Cir. 1977)).

B.  *Personal Jurisdiction*

The Due Process Clause protects defendants from binding judgments of foreign states with which the defendants had no significant "contacts, ties, or relations." *Burger King v. Rudzewicz,* 471 U.S. 462, 471–72 (1985) (quoting *Int'l Shoe v. Wash.,* 326 U.S. 310, 319 (1945)). Due process requires that a defendant be provided a "fair warning" and a "degree of predictability" regarding how his/her conduct may subject him/her to legal process and liability in a particular forum. *Burger King,* 471 U.S. at 472.

To exercise personal jurisdiction over a defendant, a federal court sitting in diversity must undertake a two-step inquiry. *IMO Indus., Inc. v. Kiekert AG,* 155 F.3d 254, 258–59 (3d Cir. 1998). First, a court must determine whether the applicable state jurisdictional statute allows it to exercise jurisdiction under the circumstances of the particular case. *Id.* at 259. Second, a court must determine whether the reach of the state statute comports with the Due Process Clause of the Federal Constitution. *Id.* In Pennsylvania, where the relevant long-arm statute provides for jurisdiction "based on the most minimum contact with th[e] Commonwealth allowed under the Constitution of the United States," 42 Pa. Cons.Stat. § 5322(b), this inquiry is collapsed into a single step, i.e., whether the Federal Constitution allows the state to exercise personal

jurisdiction over the defendant. *See IMO Indus.,* 155 F.3d at 259. The constitutional test used to answer this question depends upon whether the jurisdiction sought is "general" or "specific." *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–15 (1984); *see also Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1221 (3d Cir. 1992).

Only specific jurisdiction is relevant to this matter. "Specific jurisdiction" is "personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros,* 466 U.S. at 414 n. 8. To establish specific personal jurisdiction, a plaintiff must show that a defendant had fair warning that he or she was subject to legal process in a particular state because the defendant had "minimum contacts" with the state. *Marten v. Godwin,* 499 F.3d 290, 296 (3d Cir. 2007) (citing *Burger King,* 47 U.S. at 472).

In general, a court must analyze questions of personal jurisdiction on a defendant-specific basis. *Miller Yacht Sales,* 384 F.3d at 95 n. 1. Similarly, a court usually determines specific jurisdiction on a claim-by-claim basis. *O'Connor v. Sandy Lane Hotel Co., Ltd.,* 496 F.3d 312, 318 n. 3 (3d Cir. 2007) (citing *Remick v. Manfredy,* 238 F.3d 248, 255–56 (3d Cir. 2001)). Federal Rule of Civil Procedure 4(k) authorizes a court to have personal jurisdiction over non-state residents to the extent Pennsylvania law allows. *See* Fed.R.Civ.P. 4(k).  Specifically, the statute provides,

> (a) General rule.--A tribunal of this Commonwealth may exercise personal jurisdiction over a person (or the personal representative of a deceased individual who would be subject to jurisdiction under this subsection if not deceased) who acts directly or by an agent, as to a cause of action or other matter arising from such person:
> (1) Transacting any business in this Commonwealth. Without excluding other acts which may constitute transacting business in this Commonwealth, any of the following shall constitute transacting business for the purpose of this paragraph:

(i) The doing by any person in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object.

(ii) The doing of a single act in this Commonwealth for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object with the intention of initiating a series of such acts.

(iii) The shipping of merchandise directly or indirectly into or through this Commonwealth.

(iv) The engaging in any business or profession within this Commonwealth, whether or not such business requires license or approval by any government unit of this Commonwealth.

(v) The ownership, use or possession of any real property situate within this Commonwealth.

42 Pa.C.S.A. § 5322

The inquiry as to whether specific jurisdiction exists begins with the "traditional test." *See Shafik v. Curran,* 1:09-cv-02469, 2010 U.S. Dist. LEXIS 60103, at *9–17 (M.D. Pa. June 17, 2010) (applying the traditional test to a contract dispute between forum and non-forum residents). The traditional test has three parts. *Marten,* 499 F.3d at 296 (citing *O'Connor,* 496 F.3d at 317). First, the defendant must have "'purposefully directed' his activities" at the forum. *Burger King,* 471 U.S. at 472 (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774 (1984)). Second, the plaintiff's claim must "arise out of or relate to" at least one of those specific activities. *Helicopteros,* 466 U.S. at 414; *Grimes v. Vitalink Commc'ns Corp.,* 17 F.3d 1553, 1559 (3d Cir. 1994). And, third, if the prior two requirements are met, courts may consider whether the exercise of jurisdiction "comport[s] with 'fair play and substantial justice.' " *Burger King,* 471 U.S. at 476 (quoting *Int'l Shoe,* 326 U.S. at 320).

## VI. ANALYSIS AND CONCLUSIONS OF LAW

In this Court's estimation, Hufnagel has not met her burden to establish that this Court has personal jurisdiction over Ciamacco.  This Court lacks specific personal jurisdiction over

Ciamacco because she does not have sufficient minimum contacts with Pennsylvania. *See Marten*, 499 F.3d at 296. Ciamacco did not purposefully direct her activities at Pennsylvania through the contract, maintenance of a Pennsylvania resident's horses, advertising, or website activity. *See Burger King*, 471 U.S. at 472. The Court will address the sufficiency of each of these alleged contacts, in turn.

    a.   Contract

Hufnagel contends that the contract between her and the Friesian Empire provides this Court with personal jurisdiction over Ciamacco. The following case law demonstrates that Hufnagel's contention fails, under the facts of the instant case.

"In contract disputes, solicitation and formation of the contract itself are not dispositive." *Shafik*, 2010 U.S. Dist. LEXIS 60103, at *10; *see also Grand Entm't Group v. Star Medical Sales*, 988 F.2d 476, 482 (3d Cir. 1993) ("[A] contract alone does not 'automatically establish sufficient minimum contacts in the other party's home forum.'") (quoting *Burger King*, 471 U.S. at 478). Instead, the district court must consider the totality of the circumstances. *Telcordia Tech, Inc. v. Telkom SA Ltd.*, 458 F.3d 172, 177 (3d Cir. 2006). Whether the defendant is physically present in the forum state is not required, so long as the defendant "purposefully availed [himself] of the privilege of conducting activities within the forum," *O'Connor*, 496 F.3d at 317 (quoting *Hanson v. Deckla*, 357 U.S. 235, 253 (1958)), thus invoking the benefits and protections of the forum state's laws. *See Shafik*, 2010 U.S. Dist. LEXIS 60103, at *10 (citing *Manfredy*, 238 F.3d at 255); *see also Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150–51 (3d Cir. 2001) ("In modern commercial business arrangements ... communication by electronic facilities, rather than physical presence, is the rule.").

Specific factors to consider in determining personal jurisdiction over a breach of contract claim include: the location and character of the contract negotiations; whether the non-resident solicited business from the forum state; whether the non-resident invoked and received benefits under the laws of the forum state; the contemplated future consequences of the contract; the terms and provisions of the contract; and the parties' course of dealing. *Manfredy,* 238 F.3d at 255–56; *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.,* 75 F.3d 147, 151 (3d Cir. 1995); *Empire Abrasive Equip. Corp. v. H.H. Watson, Inc.,* 567 F.2d 554, 559 (3d Cir. 1977); *Strick Corp. v. A.J.F. Warehouse Distribs., Inc.,* 532 F.Supp. 951, 958 (E.D.Pa. 1982).[10]

In *Rotondo Weinreich Enterprises, Inc. v. Rock City Mechanical, Inc.,* the district court held that:

> Where the only contacts an out of state defendant has with the forum state are that it concluded a contract with a forum state plaintiff and sent some related communications to that plaintiff, and where the contract negotiations were initiated by the plaintiff, the contract is to be performed entirely outside the forum state, the contract does not contain a choice-of-law clause designating the application of forum state law, and the contract does not create long-term or substantial ties with the forum state, the defendant does not have sufficient contacts.

No. Civ.A. 04-5285, 2005 WL 119571 (E.D.Pa. Jan. 19, 2005). Similarly, in *Novacare, Inc. v. Strategic Theracare Alliance,* the court concluded that it lacked personal jurisdiction over the non-resident defendants, whose contracts to provide services in their home state were made with a Pennsylvania corporation; contained notice provisions indicating the plaintiffs' Pennsylvania

---

[10] Ciamacco is the owner of the Friesian Empire.  "In certain situations, 'jurisdiction over corporate officers in their personal capacities may be based on acts performed in their corporate capacity.'" *Hyndman v. Johnson,* Civil Action No. 10-7131, 2011 U.S. Dist. LEXIS 14871, at *11(E.D. Pa. Feb. 15, 2011) (quoting *American Int'l Airways, Inc. v. American Int'l Group, Inc.,* Civ. A. No. 90–7135, 1991 U.S. Dist. LEXIS 6888, at *10 (E.D. Pa. May 21, 1991)). Specifically, "when personal jurisdiction is based on an officer's corporate activities, only those actions taken within the forum state are to be considered in the jurisdictional analysis." *Hyndman,* 2011 U.S. Dist. LEXIS 14871, at *12. "Otherwise, 'an individual's transaction of business solely as an officer or agent of a corporation does not create personal jurisdiction over that individual.'" *Id.* (quoting *Feld v. Tele–View, Inc.,* 422 F.Supp. 1100, 1104 (E.D. Pa. 1976)).

address; contained Pennsylvania choice of law provisions; and resulted in significant correspondence, payments by check, and occasional telephone contact—each by the defendant to the plaintiff in Pennsylvania. *Novacare, Inc. v. Strategic Theracare Alliance,* No. Civ. A. 98–6205, 1999 WL 259848 (E.D.Pa. Apr. 30, 1999); *see also Budget Blinds, Inc. v. White,* 536 F.3d 244, 261–263 (3d Cir. 2008) (indicating that although a choice-of-law provision may reinforce a party's "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there," a court should hesitate to attribute such a meaning to the provision if it has been changed at the insistence of the forum resident) (quoting *Burger King,* 471 U.S. at 482).

The facts of this case parallel those of *Rotondo*. Ciamacco has only dealt with two other Pennsylvania residents in connection with the Friesian Empire for services which were rendered in Ohio. (Docket No. 39 at p.18, lns. 1-8; p. 19, lns. 13-18; p.49, lns. 1-4; 18-20). In the instant case, Ciamacco, an Ohio resident, entered into a contract with Hufnagel, a Pennsylvania resident. (Docket No. 5-1). The contract negotiations were initiated by Plaintiff and occurred in Ohio. (Docket No. 38 at ¶¶ 9-10; Docket No. 39 at p. 57, lns. 1-12; p.70, lns. 19-25; p.74, lns.8-9; p.76, lns. 20-23). The contract was to be performed entirely in Ohio and made reference to Ohio law. (Docket No. 5-1, p. 7). The allegations concerning the care or treatment of the horses stem from acts or omissions that occurred in Ohio. (Docket No. 38 at ¶¶ 4, 19, 21, 27-41). Given same, the contract did not create substantial ties with Pennsylvania. Therefore, counseled by the aforementioned case law, Ciamacco does not have sufficient contacts with Pennsylvania, based upon the contract.

b. Maintenance of a Pennsylvania Resident's Horses

Plaintiff asserts that because Ciamacco intentionally accepted a Pennsylvania resident's horses to train on her farm, knowing that the horses were to be returned to Pennsylvania, she is

subject to this Court's jurisdiction. (Docket No. 8 at 6-7). The following case law demonstrates that this assertion likewise fails, under the facts of the instant case.

In *Harnish, et al. v. Liberty Farm Equine Reproduction Center, LLC, et al.*, 3:10 CV 511, 2011 WL 1750095 (N.D.Ind. May 6, 2011), the Indiana plaintiffs first spoke with the Kentucky defendants on the telephone about the defendants' horse breeding services. *Id.* at *3. Following their initial conversation, the plaintiffs had second thoughts about using the defendants' services. *Id.* Thereafter, the defendants requested a meeting at the plaintiffs' Indiana farm to convince them to utilize the defendants' horse breeding services. *Id.* Based on the defendants' representations in Indiana, the parties entered an agreement in which the plaintiffs entrusted their horses to the defendants' care in Kentucky for boarding and semen collection. *Id.* The defendants picked up at least one of the plaintiffs' horses in Indiana and delivered it to the defendants' farm in Kentucky. *Id.* The plaintiffs' horses ultimately acquired a disease while in Kentucky, and the disease spread to Indiana through the defendants' shipment of the semen back to Indiana. *Id.*

The United States District Court for the Northern District of Indiana determined that sufficient contacts existed to confer jurisdiction, for three primary reasons. First, the defendants' trip to Indiana "to solicit business and negotiate terms of the parties' relationship is enough in itself to indicate the defendants purposefully availed themselves of the privilege of doing business in Indiana." *Id.* Second, the defendants repeatedly shipped semen to the plaintiffs in Indiana. *Id.* at *4. Third, the defendants "took it upon [themselves] to make arrangements to pick up at least one of the [plaintiffs'] horses in Indiana and deliver it to [their] farm in Kentucky." *Id.* The case before this Court is distinguishable from *Harnish*.

In the instant case, Ciamacco never traveled to Pennsylvania to solicit business or negotiate the terms of the contract. (Docket No. 39 at p. 10, lns. 14-16; p.14, lns. 14-18). Instead, Bryner, while working in Ohio, recommended that Hufnagel transfer her horses (including the two allegedly mistreated horses, which were then in Ohio) to the Friesian Empire. Consequently, Hufnagel initiated the formation of the contract in Ohio. (Docket No. 1 at ¶¶ 9-10; Docket No. 39 at p. 57, lns. 1-12; p.70, lns. 19-25).   Also, Ciamacco never traveled to Pennsylvania to pick up Hufnagel's horses and transport them to Ohio.   In fact, Ciamacco testified that she lacked the ability to transport horses across state lines. (Docket No. 39 at p. 52, lns. 9-11 ).  Rather, as previously pointed out, Hufnagel, her husband and Bryner transported the horses to the Friesian Empire, with no assistance from Ciamacco. (*Id*. at p.76, lns. 7-9). Moreover, the allegations concerning the care or treatment of the horses stem from acts or omissions that occurred in Ohio. (Docket No. 38 at ¶¶ 4, 19, 21, 27-41).  Based on the foregoing, Ciamacco does not have sufficient contacts with Pennsylvania to permit this Court to impose jurisdiction over her because she accepted a Pennsylvania resident's horses to train on her farm, knowing that the horses were to be returned to Pennsylvania.

c.   Advertising

Hufnagel argues that because Ciamacco may have advertised in the FHANA journal, she is subject to this Court's jurisdiction, as the FHANA journal is a niche publication that is distributed nationwide and it was sent to Hufnagel in Pennsylvania.[11]   Yet, in *Colvin, et al. v. Van Wormer Resorts, Inc., et al.*, 417 Fed.Appx. 183 (3d Cir. 2011), the plaintiffs learned of a fishing-camp vacation, through advertisements, appearing in a niche publication, whose circulation targeted fisherman in coastal states, such as New Jersey. *Id.* at 184-85.  The Third

---

[11]  Hufnagel asserts in her Affidavit and testimony, that to the best of her recollection, a Friesian Empire advertisement appeared in said publication. (Docket No. 9 at ¶ 5; Docket No. 39 at p.68, lns. 1-16).

Circuit relying on precedent held that such nationally distributed advertisements, with distribution to New Jersey, do not constitute a sufficient basis to establish minimum contacts in New Jersey. *Id.* at 186-87.  However, in *Colvin*, the Court's analysis did not stop there.  After the plaintiffs booked their trip, the defendants engaged in communications (including phone calls and facsimile transmissions) for the purpose of forming a contract to render services. *Id.* at 187. As a result, the Third Circuit found that the plaintiffs' home state of New Jersey had personal jurisdiction over the California defendants. *Id.* at 188.   But, the case before this Court is distinguishable from the *Colvin* case.

Upon seeing certain advertisements, the plaintiffs in *Colvin* booked a trip.   The defendants then engaged in phone and facsimile communications for the purpose of forming a contract to render services.  In the instant case, the relationship was not formed as a result of the advertisement in the FHANA journal, but was instead the result of Bryner's recommendation that Hufnagel move her horses to the Freisian Empire.  (Docket No. 38 at ¶¶ 9-10; Docket No. 39 at p. 57, lns. 1-12; p.70, lns. 19-25).   The contract was entered into and executed in Ohio and there are no allegations that terms of the contract were negotiated through telephone calls or facsimile transactions, between Ohio and Pennsylvania, as in *Colvin*.  (Docket No. 39 at p. 74, lns. 8-9; p.76, lns. 20-23).   In fact, the contract was negotiated and executed in Ohio when Hufnagel delivered her horses to the Friesian Empire. (*Id.*).[12]  As a result, Ciamacco does not have sufficient contacts with Pennsylvania because Ciamacco may have advertised in the FHANA journal.

---

[12] In the case before this Court, there is an allegation that Ciamacco sent one bill to Plaintiff via email (Docket No. 9 at ¶ 7), following the formation of the contract described above.  However, that email is not enough to demonstrate sufficient contact with Pennsylvania.  *See Marten,* 499 F.3d at 296; *see also Novacare,* 1999 WL 259848.

d.   Website Activity

Hufnagel contends that the Friesian Empire website and the Friesian Empire's horse sale listings on additional websites provides this Court with personal jurisdiction over Ciamacco. The following case law demonstrates that Hufnagel's final contention fails, under the facts of the instant case.

"If a defendant web site operator intentionally targets the site to the forum state, and/or knowingly conducts business with forum state residents via the site, then the 'purposeful availment' requirement is satisfied." *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 452 (3d Cir. 2003). Accordingly, Hufnagel must provide evidence of "the intentional nature of the defendant's conduct vis-a-vis the forum state." *Toys "R" Us, Inc.,* 318 F.3d at 452. "[T]here must be some evidence that the defendant 'purposefully availed' itself of conducting activity in the forum state, by directly targeting its website to the state, knowingly interacting with residents of the forum state via its website, or through sufficient other related contacts." *Id.* at 454.   In *Blackburn v. Walker,* the United States District Court for the Eastern District of Pennsylvania held that "[c]reating a Web Site may be felt nation or even world wide, but without more, it is not any act purposefully directed toward the forum." *Blackburn v. Walker Oriental Rug Galleries, Inc.,* 999 F.Supp. 636, 639 (E.D.Pa. 1998) (citing *Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414, 418 (9th Cir.1997)).

In the instant case, the Friesian Empire's website does not have an online store yet, but it does advertise horses for sale and sells gift certificates for on-site lessons and parties. (Docket No. 39 at p. 28, lns. 8-17). The Friesian Empire has never sold gift certificates to out of state residents. (*Id.* at p. 28, lns. 18-20). In addition, Friesian Empire employees have advertised horses for sale on various other websites, including AGDirect.com, HorseClassified.com,

DreamHorse.com and Equine.com. (*Id.* at p. 28, lns. 21-25; p. 29, lns. 1-12). However, although the Friesian Empire has sold horses through these websites to out of state residents,[13] no evidence was produced to show that Ciamacco intentionally and directly targeted these website advertisements at Pennsylvania. Therefore, this Court finds that Ciamacco did not purposefully avail herself of conducting activity in Pennsylvania, by intentionally and directly targeting her website at Pennsylvania. *See Toys "R" Us*, 318 F.3d at 454. Given same, Ciamacco does not have sufficient contacts with Pennsylvania based upon her website activity.

## VII. TRANSFER

Because this Court lacks personal jurisdiction over Ciamacco, the question remains whether the Court should dismiss this action or transfer it to the United States District Court for the Southern District of Ohio. *See Gehling v. St. George's Sch. of Med., Ltd.,* 773 F.2d 539, 544 (3d Cir. 1985) (stating that a district court lacking personal jurisdiction can transfer a case to a district in which the case could have originally been brought).[14] The language of Section 1631 provides, in pertinent part:

> Whenever a civil action is filed in a court ... and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed ... and the action ... shall proceed as if it has been filed in ... the court to which it is transferred on the date upon which it was actually filed in ... the court from which it is transferred.

---

[13] Including Florida, (Docket No. 39 at p. 29, lns. 18-20; p.30, lns. 18-20), Indiana, Louisiana and West Virginia (*Id.* at p. 31, lns. 4-23; p. 33, lns. 1-5; p. 33, lns. 8-12).

[14] Although Ciamacco requests such a transfer as an alternative to her Motion to Dismiss, under 28 U.S.C. § 1631, the Court may *sua sponte* transfer this matter to a judicial district where the matter could have been brought. *See Junge v. Wheeling Island Gaming Inc.,* Civ. A. No. 10-1033, 2010 WL 4537052 (W.D.Pa. Nov. 2, 2010) (holding that transfer under 28 U.S.C. § 1631 is proper even if the parties do not invoke said provision) (citing *Chicosky v. Presbyterian Med. Ctr.,* 979 F.Supp. 316, 320–23 (D.N.J. 1997)).

28 U.S.C. § 1631.

In this case, the interests of justice are better served if this case is transferred to the United States District Court for the Southern District of Ohio, rather than dismissed. Personal jurisdiction over Ciamacco and venue are proper in that court. Because this case stems from the alleged acts or omissions which occurred at the Friesian Empire in Ohio, the majority of the evidence and witnesses are located in Ohio. To that end, in the event that a site visit is necessary, the Friesian Empire is located in the Southern District of Ohio. In addition, Ohio has an interest in regulating businesses within its borders. Moreover, such a transfer will serve the interests of justice because it will eliminate the need for Hufnagel to incur additional filing costs and will avoid any statute of limitations problems that could arise from an outright dismissal at this point. *See Lawman Armor Corp. v. Simon,* 319 F.Supp.2d 499, 507 (E.D.Pa. 2004) ("[N]ormally transfer will be in the interest of justice because dismissal of an action that could be brought elsewhere is time-consuming and justice-defeating."). By transferring this action to a district court in the State of Ohio, the Court is mindful of the potential financial hardship and inconvenience that Hufnagel may incur as the result of such a transfer. Nonetheless, cost and inconvenience to Hufnagel do not entitle the Court to disregard well-established jurisdictional requirements. *See Castapheny v. W. Va. State Police,* Civ. A. No. 09-0424, 2010 WL 1901817 (W.D.Pa. Apr. 15, 2010).

VIII. CONCLUSION

Based on the foregoing, this Court finds that Ciamacco's Motion to Dismiss is granted to the extent that Hufnagel seeks a transfer to the United States District Court for the Southern District of Ohio because Hufnagel has failed to demonstrate that Ciamacco is subject to the personal jurisdiction of this Court and the instant matter could have been originally filed in the

United States District Court for the Southern District of Ohio, and a transfer to such court is in

the interests of justice.  An appropriate Order follows.

_s/Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

cc/ecf:  All counsel of record

Date: March 20, 2012